| | | |
|---|---|---|
| Minute Order Form (06/97) | | |

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4358 | **DATE** | 2/18/2004 |
| **CASE TITLE** | Christina Carpanzano vs. College of DuPage | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Defendants' motion for summary judgment (26-1) is granted in part and denied in part. Judgment is entered in favor of defendant College of DuPage and against plaintiff as to Count I of the amended complaint. The motion for summary judgment is denied as to Count I against defendants Mary Lou Emami and Joyce Abel, and denied as to Counts II and III. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices 2 | |
| X | Notices faxed by judge's staff. | | FEB 18 2004 date docketed | 40 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date faxed noticed 2/18/04 | |
| SLB | courtroom deputy's initials | Date/time received in central Clerk's Office | faxing Deputy initial SLB | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTINA CARPANZANO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 03 C 4358 |
| v. ) | |
| ) | Judge George W. Lindberg |
| COLLEGE OF DUPAGE, an Illinois municipal ) | |
| entity, MARY LOU EMAMI, and JOYCE ABEL, ) | |
| individually and in their official capacities ) | |
| as employees of College of DuPage, ) | **DOCKETED** |
| ) | |
| Defendants. ) | FEB 1 8 2004 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christina Carpanzano brought this action against defendants College of DuPage ("College"), Mary Lou Emami ("Emami"), and Joyce Abel ("Abel") pursuant to 42 U.S.C. § 1983, alleging a claim of retaliation in violation of plaintiff's rights under the First Amendment to the United States Constitution (Count I). The amended complaint also alleges state law claims of retaliatory discharge (Count II) and intentional infliction of emotional distress (Count III). Before the court is defendants' motion for summary judgment. For the reasons stated below, defendants' motion is granted in part and denied in part.

### I. Factual Background

Plaintiff was an account manager with defendant College's Center for Corporate Training ("CCT"), a unit of the College's Business and Professional Institute, from May 23, 2000 through March 6, 2003. Defendant Emami is the CCT's Center Manager, and supervises the account managers and support staff employed there. Defendant Abel is the Executive Director of the Business and Professional Institute.



The CCT provides training and services to employees of businesses, organizations, and public entities. CCT account managers sell these training services to clients. Account managers are also responsible for completing tracking sheets on their sales, which are used by support staff to prepare contracts.

In January 2000, the account managers sought to develop a reward/incentive program to promote teamwork and recognize the efforts of the support staff. To that end, the "team fund" was established with the assistance of the College's Finance Department. The team fund was funded by adding a charge of $5.00 to $10.00 to each class sold by the CCT. The money in the team fund was used to buy gift certificates, books, plants, and sweatshirts for the support staff, as well as catered lunches during staff meetings and holidays. Plaintiff was made aware of the team fund and its uses shortly after she started working for the CCT in May 2000.

During her employment at the CCT, plaintiff sold more contracts than any other account manager. However, according to defendants, starting in November 2000, plaintiff often failed to complete tracking sheets on her sales in a timely manner, and many of the tracking sheets she completed were inaccurate. In addition, during the summer of 2001, members of the support staff complained to Emami that when they tried to obtain information from plaintiff about contracts, plaintiff responded uncooperatively, with sarcasm and criticism. Although plaintiff conceded in her deposition that "completing these forms was not [her] strong point," she contends that problems with paperwork were common to all account managers, and that her problems with the staff were due to the staff members' difficult personalities.

Abel and Emami met with plaintiff at various times through the first half of 2002, to discuss plaintiff's problems with completing paperwork, her attendance, and her problems relating

2

to the staff. However, plaintiff's November 19, 2000 and May 31, 2001 written performance reviews were positive, and do not mention any problems with tracking sheets, attendance, or her treatment of the support staff. Although plaintiff's June 10, 2002 performance evaluation listed "customer service issues" as a barrier to effective job performance and indicated that plaintiff and Emami had discussed "communication with all staff involvement," the evaluation did not indicate that plaintiff was having problems with attendance or with completing paperwork. Plaintiff received regular pay increases while employed at the Business and Professional Institute. Due to plaintiff's "excellent attendance record" from June 2000 through July 2001, and from July 2001 through July 2002, plaintiff twice qualified for the College's attendance incentive of additional vacation time.

On June 21, 2002, the support staff initiated a meeting with Emami to discuss their continuing problems with plaintiff. The staff members reported that class instructors were complaining to them that the instructors with having difficulties communicating with plaintiff regarding course logistics and invoicing. The staff members also complained that plaintiff's problems with paperwork created accounts receivable issues.[1]

On June 26, 2002, an e-mail discussion ensued among CCT employees regarding the team fund, initiated by a reminder to support staff that the team fund was available for their use. During that discussion, plaintiff wrote: "It may be appropriate to mention who generates the funds (i.e. the Managers)." Later that day, account manager Lolly Petusky responded that "I'm sure we're all confident enough that there is no need to pat ourselves on the back to take credit for all

---

[1] Although plaintiff denies defendants' statements of fact relating to this meeting, her denial is non-responsive.

3

the work the staff accomplishes to contribute to the success of the center." Plaintiff forwarded Petusky's response to other managers, explaining to a co-worker that:

> I think it's important that they are made aware that my effort to at least gain some acknowledgement [sic] of the sales managers for a job well done in a diffuclt [sic] year is seen as a self-congratulatory activity. Very nice. If I can opt out of the Team fund, consider me out. I will no longer include it in my pricing. Like a lot of things, it's another joke.

On June 27, 2002, plaintiff expanded on her statement in another e-mail:

> Everytime [sic] I have read my statement ... about it may be appropriate to mention who gets the funds ... I just have to wonder at the entire organizations' [sic] inability to say THANK YOU to us....Many times people just want to be recognized for their contributions. If you follow the thread, I think I'm ASKING someone to say thank you. What I got what [sic] a diatribe on self-congratulatory behavior. If that's how ML [Emami] and JA [Abel] are going to show appreciation to those who make the Team fund happen, I don't want to play the game.

Also on June 27, 2002, plaintiff asked Sue Benton, in the Human Resources Department, whether plaintiff was required to contribute to the team fund, explaining that she no longer wished to do so. Benton responded that she was unfamiliar with the team fund. According to plaintiff, she explained to Benton that the team fund was funded with $10 from each class sold. According to Benton, plaintiff told her that the team fund was funded through deductions from plaintiff's and other account managers' compensation. Benton responded that the team fund was not sanctioned by the College.

On June 28, 2002, plaintiff wrote a memorandum to Emami, which was copied to Abel, stating that she would no longer contribute to the team fund. Plaintiff explained in the memorandum that she had

> professional and ethical problems with the arrangement and usage of this fund. It is not a college-approved fund, as we have been led to believe, nor are contributions 'mandatory'. There is poor accountability, if any. On several

4

occasions, the amount of my contribution designated on my pricing sheets has been changed (increased) without my approval. This is not a professional activity in which I willingly choose to participate.

Plaintiff later testified that her professional and ethical objections to the team fund were based on her belief that the money contributed to the team fund was taken out of profits that otherwise would have gone to the College. In July 2002, the account managers voted to end the team fund.

On July 9, 2002, Abel and Emami issued a warning memorandum to plaintiff, indicating that members of the support staff had complained about plaintiff's negative remarks to them, and directing plaintiff to stop this "abusive behavior." The memorandum also observed that plaintiff had failed to come into the office for several days beginning June 27, 2002, which caused problems regarding final grant reports. The memorandum directed plaintiff to be present in the CCT office when not on sales calls or performing contract-related duties. This memorandum was the first written warning plaintiff had received during her employment with the CCT.

According to defendants, plaintiff's problems continued, and on December 2, 2002, Emami and Abel issued a second warning memorandum to plaintiff. This memorandum directed plaintiff to immediately cease "disruptive behavior," to be present in the office during regular business hours for a minimum of 35% of the time and any other time she was not on a client call, to demonstrate a cooperative team attitude, to attend meetings unless prior arrangements were made with the Center Manager, and to provide accurate information on all training paperwork.

According to defendants, in the following two months, plaintiff continued to provide inaccurate information on her paperwork. In addition, defendants claim that plaintiff provided the home telephone number of one of CCT's instructors to another training company without the instructor's permission. Finally, defendants claim that plaintiff attempted to exclude Emami from

5

a client meeting.

On January 31, 2003, Emami suspended plaintiff with pay pending a review of Emami's recommendation for plaintiff's dismissal by the College's Vice President for Academic Affairs. Plaintiff was terminated on March 6, 2003.

## II. Discussion

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, and must present more than a scintilla of evidence to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

To prevail on a First Amendment retaliation claim in an employment context, a plaintiff must prove that her speech was a matter of public concern, and that her speech played at least a substantial part in the employer's decision to take an adverse employment action against her. Gustafson v. Jones, 290 F.3d 895, 906 (7th Cir. 2002). If the plaintiff meets her burden on those two elements, the employer may nevertheless prevail if it proves, by a preponderance of the evidence, that its interest in efficiently providing government services outweighs the plaintiff's First Amendment interests, or if it proves that it would have taken the action even in the absence

6

of the speech. Id.

Defendants first argue that plaintiff's First Amendment claim fails because her June 28, 2002 memorandum opting out of the team fund did not address a matter of public concern. To determine whether speech addresses a matter of public concern, the court examines the "content, form, and context" of the speech, "as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). Of these factors, content is the most important, but the speaker's motive in making the statement is also relevant. Button v. Kibby-Brown, 146 F.3d 526, 529 (7th Cir. 1998). Speech does not address a matter of public concern if it "concerns a subject of public interest but the expression addresses only the personal effect upon the employee." Id. at 529-30 (quoting Marshall v. Porter County Plan Comm'n, 32 F.3d 1215, 1219 (7th Cir. 1994)). Thus, the court must determine "whether the speaker is speaking 'more like a citizen or a disgruntled employee whose statements are primarily of personal interest.'" Id. at 530 (quoting Colburn v. Trustees of Ind. Univ., 973 F.2d 581, 585 (7th Cir. 1992)).

Plaintiff argues that her memorandum opting out of contributing to the team fund exposed what she believed to be the improper diversion of funds that should have gone into the College's operating fund. Plaintiff registered her objection to the team fund immediately after being advised that the fund was not sanctioned by the College. In addition, plaintiff did not, at any time, ask to stop all forms of rewarding support staff.

Defendants argue that plaintiff objected to the team fund merely to further her own personal interest. As defendants observe, plaintiff did not raise any objection to the team fund for over two years, despite being aware of its existence and its uses. Instead, plaintiff only decided to cease contributing to the team fund after her relationship with the support staff -- the beneficiaries

7

of the team fund – had deteriorated. Defendants point to the e-mail exchange among plaintiff and other account managers on June 26 and 27, 2002 as evidence that plaintiff's objections to the team fund sprang from her feeling that the support staff did not adequately appreciate her efforts, rather than some public-minded motive. Finally, defendants argue that, contrary to plaintiff's statement in her June 28, 2002 memorandum, the team fund was legal and proper.

Exposing the misuse of public funds may be a matter of public concern. See Breuer v. Hart, 909 F.2d 1035, 1039 (7th Cir. 1990) (allegations that sheriff stole county property and allowed employee to fraudulently accept compensation were matters of public concern). Plaintiff may well have had a personal interest in striking back against the support staff at a time when her relationship with the support staff was strained, and when plaintiff felt that her efforts that contributed to the team fund were insufficiently appreciated. However, "the fact that an employee speaks at least in part for personal reasons will not automatically deprive her statements of the protections afforded to speech on a matter of public concern." See Cliff v. Board of Sch. Comm'rs, 42 F.3d 403, 410 (7th Cir. 1994). The court concludes that plaintiff has offered enough evidence to survive summary judgment on the issue of whether her statement was a matter of public concern.[2]

Moreover, a reasonable jury could conclude that plaintiff's speech played at least a substantial part in defendants' decision to terminate her. Defendants initiated their progressive

---

[2] The court need not decide at this time whether the team fund actually was a legal and proper use of College funds. There is at least some evidence that plaintiff reasonably believed that the team fund was not legitimate when she wrote her memorandum, and thus there would be an issue of fact even if the court concluded that the team fund was in fact legitimate. Cf. Brenner v. Brown, 36 F.3d 18, 20 (7th Cir. 1994) (speech made with reckless disregard for the truth does not receive First Amendment protection).

8

discipline procedure by issuing their written warning to plaintiff only eleven days after plaintiff sent her memorandum opting out of the team fund. This warning was the first written reprimand plaintiff had received during her employment with the College, even though plaintiff had had an ongoing problem with communicating positively with staff members. Although defendants may have had numerous valid reasons to discipline and terminate plaintiff, the court cannot conclude that, as a matter of law, defendants would have terminated plaintiff's employment even in the absence of her objection to the team fund.[3]

The court next turns to the College's argument that it is not liable under Section 1983 because plaintiff cannot show that she was terminated by a person with final policymaking authority. A municipal entity cannot be held vicariously liable under Section 1983 through the doctrine of *respondeat superior*. Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978). Such an entity can be sued under Section 1983 only if the constitutional injury was authorized by express policy, authorized through a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or caused by a person with final policymaking authority. See McCormick v. City of Chicago, 230 F.3d 319, 324 (7th Cir. 2000).

Plaintiff argues that the College is liable for Emami's and Abel's decision to terminate her because it delegated final policymaking authority to them. Plaintiff does not dispute that under Illinois law, a community college's board has the sole, non-delegable power to establish policies governing the employment and dismissal of community college personnel. See 110 ILCS 805/3-

---

[3] Defendants do not argue that their interest in efficiently providing government services outweighs the plaintiff's First Amendment interests.

42; Morgan v. Board of Trustees, No. 98 C 1095, 1999 WL 160369, at *6 (N.D. Ill. Mar. 9, 1999). Instead, plaintiff argues that the College's Board gave Emami and Abel extensive, unreviewed control over the CCT employees, resulting in a de facto delegation of final policymaking authority.

In Kujawski v. Board of Comm'rs, 183 F.3d 734, 735 (7th Cir. 1999), the Seventh Circuit reviewed the district court's dismissal of a federal claim against a county board of commissioners, that alleged that the county corrections department's chief probation officer had terminated a corrections officer in retaliation for the officer's exercise of his First Amendment rights. The defendants had argued that the Board could not have delegated policymaking authority to the chief probation officer because state law provided that policymaking authority over corrections could only be expressly delegated, and it did not make any express delegation. Id. at 739 n.4. The Seventh Circuit observed that a state statute is not necessarily determinative of a delegation issue. Id. Rather, courts "must take into account both state positive law and state custom that has the force of law." Id. Otherwise, a municipality could "avoid its constitutional responsibilities by delegating, in violation of state law, its responsibilities." Id. Since the plaintiff had provided evidence that the chief probation officer set employment policies for the corrections department, and that the Board never reviewed his decisions as a matter of policy, the court concluded that an issue of fact existed as to whether the Board had delegated its authority to the chief probation officer. Id. at 739-40.

Here, there is no evidence that Emami and Abel set policy for hiring and firing employees. Plaintiff has submitted evidence that Emami and Abel made hiring and firing decisions, but that alone is insufficient to establish that they are policymakers. See Kujawski, 183 F.3d at 739. The

only evidence plaintiff offers in support of her contention that Emami and Abel set policy is Abel's ambiguous testimony, in response to a question as to whether she had a policy and procedures manual in her department, that "[w]e were trying to develop a process. We called it procedures, but it was really process of what goes on." In the same segment of her deposition, however, Abel testified that "[p]olicies are established by the Board of Trustees" and that she herself does not make any policy or procedure. Moreover, unlike in Kujawski, in this case there is no evidence that the Board had a policy of not intervening in Emami's and Abel's personnel decisions. Cf. Kujawski, 183 F.3d at 739. The court concludes that plaintiff has failed to show that Emami and Abel were delegated final policymaking authority.

Plaintiff contends in the alternative that the College is liable for Emami's and Abel's decision to terminate her because an authorized policymaker ratified their decision. On February 3, 2003, Abel recommended to Christopher Picard, the College's Vice President of Academic Affairs, that plaintiff be terminated. Picard advised plaintiff that he concurred with Abel's recommendation. Plaintiff appealed the decision to the Classified/Administrative Board of Appeals, which reviewed the evidence and found no basis for rescinding plaintiff's termination. On May 5, 2003, Michael Murphy, the College's President, advised plaintiff that he had reviewed the action of the Classified/Administrative Board of Appeals, and affirmed it.

A municipality may be liable under Section 1983 if a person or body with final policymaking authority approves a subordinate's decision and the basis for it. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). Plaintiff contends that Murphy was a final policymaker by virtue of his "broad discretionary powers," as described in the College's Employee Handbook. Plaintiff argues that Murphy ratified Emami's and Abel's actions, subjecting the College to

11

Section 1983 liability.

The court disagrees. Although the Employee Handbook states that the College's President "is authorized to exercise broad discretionary powers established by the board," there is no evidence that those broad discretionary powers include final policymaking authority in employment matters, in contravention of state law. Indeed, the Employee Handbook also states that the President "recommends policies to the board" and "carries out those approved by the board." Since plaintiff has failed to establish a basis for Section 1983 liability against the College, defendants' motion for summary judgment is granted as to Count I of the amended complaint against the College. The remainder of the motion is denied.

**ORDERED:** Defendants' motion for summary judgment [26-1] is granted in part and denied in part. Judgment is entered in favor of defendant College of DuPage and against plaintiff as to Count I of the amended complaint. The motion for summary judgment is denied as to Count I against defendants Mary Lou Emami and Joyce Abel, and is denied as to Counts II and III.

ENTER:

*/s/ George W. Lindberg*

George W. Lindberg
Senior United States District Judge

DATED: **FEB 1 8 2004**